UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEATRICE TANNER-BROWN, : <br> 11923 Cedar Avenue : <br> Hawthorne, CA 90250; on behalf of herself : <br> and all other persons similarly situated; : <br> : <br> and the : <br> : <br> HARVEST INSTITUTE FREEDMAN : <br> FEDERATION, LLC : <br> c/o 5614 Oak Place : <br> Bethesda, MD 20817; on behalf of : <br> itself and all persons similarly situated : <br> : <br> Plaintiffs, : <br> : <br> vs. : <br> : <br> SALLY JEWELL : <br> Secretary of the Interior : <br> 1849 C. Street, NW : <br> Washington, D.C. 20240 : <br> : <br> and : <br> : <br> KEVIN WASHBURN : <br> Assistant Secretary – Indian Affairs : <br> 1849 C. Street, N.W. : <br> Washington, D.C. 20240 : <br> : <br> Defendants. : | Case No. _____ <br><br> Judge _____ <br><br><br> CLASS ACTION <br> ALLEGATIONS |

# **COMPLAINT**

Plaintiffs, by their undersigned attorney for their Class Action Complaint, allege upon personal knowledge as to themselves and their own acts, and upon information and belief (based upon the investigation of their counsel) as to all other matters, as to which allegations they believe substantial evidentiary support will exist after a reasonable opportunity for further investigation and discovery as follows:

## I.     NATURE OF THE ACTION

1. Plaintiffs bring this action as a Class Action under Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who are descendants of allottees under the Curtis Act of 1898 and subject to the provisions of Section 6 of the Act of May 27, 1908, 34 Stat. 312, (hereinafter the "Act") which retained restrictions against alienation or certain lands allotted to Freedmen minors, who were enrolled members of the Five Civilized Indian Tribes[1].

2. The Act of May 27, 1908 imposed specific and detailed fiduciary duties upon the Secretary of Interior to preserve and protect the interests of minor Freedmen allottees in royalties from leases on land allotted to Freedmen minors and to take all available actions

---

[1] The Five Civilized Tribes allied themselves with the Confederacy during the Civil War and attempted to maintain slaves following the War.  As a result of the Tribes disloyalty to the United States during the Civil War all territory owned by the Tribes was forfeited.  The status of the Tribes was reestablished under Treaties entered in 1866.

The Treaties of 1866 came into existence as a result of the post-civil war reconciliation effort, and provided a means for the Five Tribes to re-establish their government-to-government relations with the United States, following their ill-concerned alliances with the Confederate States of America and long history of slavery.  The Treaties addressed a number of issues for readmitting the Five Tribes back into the federal union, including amnesty for all war crimes committed by its citizens, establishment of federal courts in the Indian territory, the settlement of "civilized friendly Indians" within the Tribes and the adoption of all freed slaves and free colored persons into the Tribes as tribal citizens.  Article IX of the Cherokee Treaty is an example, and provides:

> The Cherokee nation having, voluntarily, in February, eighteen hundred and sixty-three, by an act of their national council, forever abolished slavery, hereby covenant and agree that never hereafter shall either slavery or involuntary servitude exist in their nation otherwise than in the punishment of crime, whereof the party shall have been duly convicted, in accordance with laws applicable to all the members of said tribe alike. They further agree that **all freedmen who have been liberated by voluntary act of their former owners by law, as well as all free colored persons who were in the country at the commencement of the rebellion, and are now residents there in, or who may return within six months, and their descendants, shall have all the rights of native Cherokees:** Provided, that owners of slaves so emancipated in the Cherokee nation shall never receive any compensation or pay for the slaves so emancipated.

Under the 1866 Treaties, Freedmen and their descendants, were to receive all the rights of native Tribe members.  "All rights" can only be read to mean all rights, including but not limited to, the right of citizenship.  See, Appellant Brief, Cherokee Nation v. Nash, Case No. SC-2011-02, Supreme Court of the Cherokee Nation,(emphasis added).

2

to prevent dissipation or deterioration of these allotments and royalties through carelessness,

   3.  negligence or exploitation of Freedmen minors.

   4.  Under the specific statutory mandate imposed by the Act of May 27, 1908, upon the Secretary of Interior to assure that if land allotted to Freedmen minors and royalties derived therefrom, were not being properly cared for by the guardians or curators appointed under the Act by probate courts of the State of Oklahoma, the Secretary was required to act to prevent the land and revenue from being dissipated, or permitted to deteriorate in value by reason of negligence, carelessness or incompetency of the guardian or exploitation of minor Freedmen. The specific fiduciary duties imposed upon the Secretary of Interior by the Act of May 27, 1908 includes a statutory duty to account to Freedmen minors or their descendants subject to Section 6 for revenue from leases on allotted land.

   5.  Notwithstanding demand from Plaintiffs for an accounting of revenue from leases on restricted lands during the period that these lands were held by Freedmen minors and not subject to alienation, Defendants have failed to provide the requested accounting.

   6.  This action is therefore being instituted to compel Defendants to comply with their statutorily created fiduciary duties under the Act of May 27, 1908 to Freedmen minors, and their descendants for an accounting of revenue generated from leases on restricted land held by Freedman minors.

## II.    JURISDICTION AND VENUE

7. This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, 5 U.S.C. §701, et seq., the Administrative Procedures Act, 28 U.S.C. §1491, The Tucker Act and 28 U.S.C. §1505, The Indian Tucker Act.

8. Venue is properly laid in this district under 28 U.S.C. §1391 inasmuch as the defendants reside in this district and all of the fiduciary breaches for which relief is sought occurred in this district.

### III.   PARTIES

9. Plaintiff, Leatrice Tanner-Brown Leatrice Tanner-Brown, is a representative of the putative class of Freedmen descendants who by reason of their interests in restricted allotments under the Curtis Act of 1898, the ante-bellum Treaties of 1866, lost or mismanaged trust property, has standing to sue the United States for breaches of trust related to allotted lands or lease and royalty payments from restricted land. The grandfather of Plaintiff, Leatrice Tanner-Brown, George Curls, was enrolled on the Dawes Roll of the Cherokee Freedmen, pursuant to the Dawes Act on July 1, 1902. Cherokee Freedmen Roll, Cherokee Freedman 4204. At the time of his enrollment, George Curls was five years old, having been born to former Cherokee slave parents in Indian Country, Oklahoma in 1897.

Mr. Curls received forty and twenty acre allotment deeds from the Cherokee Tribe under the Curtis Act on December 5, 1910. Under these two deeds, Mr. Curls received Curtis Act allotments equaling 60 acres. These allotments were received at a point in time when Mr. Curls was a minor, thirteen years old.

Under the Act of May 27, 1908, restrictions against alienation of Freedmen allotments or royalties received therefrom, were retained for minors, such as Mr. Curls.

Under the Act of 1908 any royalties from allotments owned by minor Freedmen were to be controlled and monitored by the Department of Interior.  <u>See</u>, Sections 2 and 6 of Act of May 27, 1908.  Any royalties derived from leases on Mr. Curls' allotments were subject to the fiduciary duties imposed by the Act of May 27, 1908 on the Secretary of the Department of Interior.  The Interior Department has no records of these royalties, despite the land being leased for oil and gas drilling and having generated substantial revenue.

10. Plaintiff, Harvest Institute Freedman Federation, LLC is a representative of the class and is an Ohio limited liability company formed for the specific purpose of seeking redress through the courts to compel the United States to perform obligations owed under federal law to Freedmen.  The Institute has conducted research, provided financing and required legal resources, including counsel, to advocate on behalf of Freedmen.  The Institute's membership is comprised of persons with African and Native American ancestry, each of whom has standing to sue their own right.  The interests which the Institute seeks to protect are germane to its purpose and do not require the participation of individual Freedmen.

11. Defendant Jewell is the United States Secretary of the Interior.  The Department of the Interior is the federal agency with oversight of the Bureau of Indian Affairs and has the statutory duty to enforce, administer and assure compliance by the United States with the terms and obligations of federal law.  Defendant is sued in her official capacity only.

12. Defendant Washburn is the Assistant Secretary with jurisdiction over the Bureau of Indian Affairs (BIA) which has responsibility for the administration and management of 55.7 million acres of land held in trust by the United States for American Indians,

Indian tribes and Alaska Natives and to implement the terms of federal law. Defendant is sued in his official capacity only.

## IV. CLASS ACTION ALLEGATIONS

13. Plaintiffs bring this action as a Class Action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who are or were descendants of Freedmen minor allottees of the Five Civilized Tribes.

14. During the Civil War the Five Civilized Tribes, the Seminole, Cherokee, Choctaw, Creek and Chickasaw, entered into treaties with the Confederacy, severing their relations with the United States. As a result of these acts of disloyalty, the Five Civilized Tribes forfeited all tribal lands and their status as government wards. In 1866, the United States made treaties with each of the Five Civilized Tribes, setting the terms on which the tribes would continue to exist within the United States and regain their land and trust beneficiary status. All of the treaties with the Five Civilized Tribes eradicated slavery within the tribes and provided that the emancipated "Freedmen" would have equal rights within the tribes. Although these Treaties had a common purpose, the provisions of the various Treaties were not identical. However, under the treaties the Freedmen were emancipated and given civic status equal to Indians whether the Freedmen were adopted into the Tribes or not. The following is a summary of the provisions of the treaties pertinent to this action.

**The Seminole Treaty**: The United States entered into its first antebellum treaty with the Seminole in 1866. 14 Stat. 755. The treaty provided that the Freedmen members would have rights equal to those of Seminoles by blood:

> And inasmuch as there are among the Seminoles many persons of African descent and blood, who have no interest or property in the soil, and no

recognized civil rights, it is stipulated that hereafter these persons and their descendants, and such other of the same race as shall be permitted by said nation to settle there, <u>shall have and enjoy all the rights of native citizens, and the laws of said nation shall be equally binding upon all persons of whatever race or color who may be adopted as citizens or members of said tribe.</u>

14 Stat. 755, 756. In 1898, the Seminole entered into an agreement with the United States to allot its land held in common to individual members. 30 Stat. 567. The agreement made no distinction between the Freedmen members and the members by blood.

**The Creek Treaty:** The United States' treaty with the Creek is similar to its treaty with the Seminole. It provided that the Creek Freedmen would have all the rights of members by blood, including the right to share equally in land and funds:

> [A]nd inasmuch as there are among the Creeks many persons of African descent, who have no interest in the soil, it is stipulated that hereafter those persons lawfully residing in said Creek country under their laws and usages...<u>shall have and enjoy all the rights and privileges of native citizens, including an equal interest in the soil and national funds, and the laws of said nation shall be equally binding upon and give equal protection to all such persons</u>, and all others, of whatever race or color, who may be adopted as citizens or members of said tribe.

14 Stat. 785, 786. In 1897, the United States and the Creek Nation agreed to terms on which the Creek Nation's common lands would be allotted. 30 Stat. 496, 514. The agreement made no distinction between Creeks by blood and the Freedmen. In 1901, the Creek entered a second agreement with the United States. 31 Stat. 861. Like the first, this agreement made no distinction between Creek Indian and Freedmen members.

**The Cherokee Agreement**: The United States entered into a treaty with the Cherokee in 1866. The treaty of 1866, inter alia is a basis for Appellants' claims here. A treaty with the Cherokee Tribe and the United States was concluded on July 19, 1866.

7

Article IV of that Treaty provided that "...[a]ll of the Cherokee freed Negros who were formerly slaves to any Cherokee, and all free Negros not having been slaves, who resided in the Cherokee nation prior to June 1, 1861...shall have the right to settle in and occupy the Canadian district...<u>and will include a quantity of land equal to 160 acres for each person who may so elect to reside in the territory...</u>" Thus, as in the case of the Choctaw and Chickasaw Freedmen, the <u>Cherokee Freedmen were "adopted into the tribe rand], [c]onsequently, they and their descendants were entitled to participate in the allotment of lands equally with members of the tribe by blood.</u>" <u>Ross v. Ickes</u>, 130 F.2d 415 (D.C.C. 1942).

**The Choctaw and Chickasaw Treaty:** The United States entered into a treaty with the Choctaw and Chickasaw Tribes on April 28, 1866. 14 Stat. 769. This treaty provided that the tribes had a choice about how to deal with their Freedmen. If the tribes made their Freedmen members within two years, the tribes would receive a portion of a trust fund, and the Freedmen would receive 40-acre allotments once the Choctaw, Chickasaw and Kansas Indians had made their selections. If the tribes did not adopt their Freedmen and the Freedmen voluntarily removed themselves to other land within Indian Territory, the tribes would get nothing and the [Freedmen would receive a portion of the trust fund. Id] The Choctaw and Chickasaw resisted adopting the Freedmen, so the Freedmen were not entitled to the 40-acre allotments. In 1883, the Choctaw adopted the Freedmen into the tribe and declared each was entitled to 40 acres. The tribe made no allotments at that time either. <u>Choctaw Nation of Indians v. United States</u>, 318 U.S. 423, 425 (1943). The Chickasaw never did adopt their Freedmen into the tribe.

8

15. In 1898, the United States enacted the Curtis Act, allotting the land of the Five Civilized Tribes. The land was not allotted earlier under the Dawes Act. In 1908 Congress removed restrictions from Freedmen allotments, except land allotted to minors. Congress imposed specific fiduciary duties on the Secretary of Interior with respect to Freedmen minor allottees. Plaintiffs seek an accounting in relation to revenue from leases on land allotted to their minor Freedmen

16. The Class consists of thousands of persons located throughout the United States, thus, the members of the Class are so numerous that joinder of all Class members in impracticable. The exact number of Class members is not presently known to plaintiffs, but can readily be determined by appropriate discovery.

17. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions. Plaintiffs have no interests that are adverse or antagonistic to those of the Class.

18. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by many individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to individually seek redress for the wrongful conduct alleged herein.

19. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

   a) Does the Secretary of Interior owe fiduciary duties to Freedmen minors or the descendants under the Act of May 27, 1908;

    b) Whether the Defendants violated the Act of May 27, 1908;

    c) Whether Plaintiffs and the members of the Class have sustained injury by reason of Defendants actions and omissions;

    d) Whether the class period extends from enactment of the Curtis Act until now, i.e. the Class period is July 1, 1898 through the present; and

    e) Whether the Defendants owe Plaintiffs an accounting.

## V.    WAIVER OF SOVEREIGN IMMUNITY

20. Plaintiffs bring their lawsuit against federal officials. Plaintiffs hereby assert a clear waiver of sovereign immunity that covers the substantive claims and remedies that they seek. The APA waives Defendants' sovereign immunity for all of Plaintiffs' claims. Section 702 states:

> An action in a court of the Untied States seeking relief other than money damages' and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States.

## VI.    THE DEFENDANTS OWE FIDUCIARY DUTIES TO THE CLASS

21. During the Class Period, the Defendants were mandated the Act to protect Freedmen minors from exploitation.

22. During the Class Period Defendants had a duty under the Act to monitor revenue derived on leases form allotments held by Freedmen minors.

## VII.  DEFENDANTS' FIDUCIARY DUTIES TO THE CLASS

23. The specific terms of the Act of May 27, 1908, state:

> SEC 6. That the persons and property of minor allottees of the Five Civilized Tribes shall, except as otherwise specifically provided by law, be

subject to the jurisdiction of the probate courts of the State of Oklahoma. The Secretary of the Interior is hereby empowered, under rules and regulations to be prescribed by him, to appoint such local representatives within the State of Oklahoma who shall be citizens of that State or now domiciled therein as he may deem necessary to inquire into and investigate the conduct of guardians or curators having in charge the estates of such minors, and whenever such representative or representatives of the Secretary of the Interior shall be of opinion that the estate of any minor is not being properly cared for by the guardian or curator, or that the same is in any manner being dissipated or wasted or being permitted to deteriorate in value by reason of the negligence or carelessness or incompetency of the guardian or curator, said representative or representatives of the Secretary of the Interior shall have power and it shall be their duty to report said matter in full to the proper probate court and take the necessary steps to have such matter fully investigated, and go to the further extent of prosecuting any necessary remedy, either civil or criminal, or both, to preserve the property and protect the interests of said minor allottees; and it shall be the further duty of such representative or representatives to make full and complete reports to the Secretary of the Interior. All such reports, either to the Secretary of the Interior or to the proper probate court, shall become public records and subject to the inspection and examination of the public, and the necessary court fees shall be allowed against the estates of May be appointed said minors.[sic]. The probate courts may, in their discretion appoint any such representative of the Secretary of the Interior as guardian or curator for such minors, without fee or charge.

And said representatives of the Secretary of the Interior are further restricted lands, authorized, and it is made their duty, to counsel and advise all allottees, adult or minor, having restricted lands of all of their legal rights with reference to their restricted lands, without charge, and to advise them in the preparation of all leases authorized by law to be made, and at the request of any allottee having restricted land he shall, with out charge, except the necessary court and recording fees and expenses, if any, in the name of the allottee, take such steps as may be necessary, including the bringing of any suit or suits and the prosecution and appeal thereof, to cancel and annul any deed, conveyance,mortgage, lease, contract to sell, power of attorney, or any other encumbrance of any kind or character, made or attempted to be made or executed in violation of this Act or any other Act of Congress, and to take all steps necessary to assist said allottees in acquiring and retaining possession of their restricted lands.

24. Under the Act of May 27, 1908, restrictions against alienation of Freedmen allotments, such as the allotments to Mr. Curls', were not removed. Accordingly, any

11

royalties derived from leases on Mr. Curls' allotments should have been accounted for by the Department of Interior under the terms of the Sections 2 and 6 of the 1908 Act. Instead the Interior Department has no record of these royalties. These failures were not innocent. They were the result of a deliberate strategy to swindle land and money from Freedmen.

25. A pervasive system of corruption and racism was ongoing in Indian Country during the period following the discovery of oil and Oklahoma Statehood, the timeframe when Mr. Curls received his allotment. See, *And Still Waters Run*, Angie Deboe, Princeton University Press, 1940. One of the primary methods utilized to circumvent restrictions on alienation of allotments was the practice of allotting land to mixed blood Indians and Freedmen under the Act of 1908. By granting allotments to Freedmen, the protections designed to prevent illiterate and uneducated allottees from being swindled by unscrupulous persons could be overcome. In the case of Mr. Curls, he was a resident of Chelsea, Oklahoma, in Rogers County. His allotment was granted while he was a minor in distant Nowata County in the midst of oil rich Cherokee Country.

> According to Angie Deboe:
>
> The Federal Government also assumed the administration of the affairs of the individual allottee. Because of their inexperience in the control of real estate, the agreements and the various acts of Congress had attempted to safeguard the Indians in the leasing and sale of their allotments.
>
> Leases for agriculture and grazing purposes were restricted in all the tribes. The Seminole Agreement contained regulations to protect the allottee, and gave the Chief supervisory authority. The Atoka Agreement contained similar safeguards but its enforcement was left to the Federal courts. The Creek Supplemental Agreement and the Cherokee Agreement specified that grazing leases for more than one year and agricultural leases for longer than five years should be subject to Departmental approval. In 1905 Congress authorized the Secretary to investigate any lease of allotted land in the Indian Territory and to refer cases of apparent fraud to the Attorney-General. The Five Tribes Act provided that all lease contracts

12

> longer than one year for the surplus of fullbloods were subject to Departmental approval, and that the homesteads of full bloods could be leased only in cases of old age or infirmity through special authorization by the Secretary.
>
> Oil men complained loudly of the delay occasioned by Departmental "red tape" in securing approval of a lease, but apparently the industry was not seriously retarded.  The regulations aimed to prevent monopoly control, by limits on acreage and strict supervision of transfers; and judging from the alternate expressions of approval and complaint, and the failure of certain attempts to evade them, they were eminently successful.  As a result the oil industry was a free-for-all scramble, with the great Mellon and Standard interests, the young oil worker who could scrape together enough money to drill a well of his own, and the gambler who must try one more "sure thing," all entering into the most unrestricted rivalry.  <u>The wild, speculative, active spirit of the oil field gave a lurid phase to the early development of the</u> Indian Territory.

See, Angie Deboe, "And Still the Waters Run", (Princeton University Pres., 1940) p. 85.

26. Although George Curls did not receive his allotment until 1910, the discovery of oil led to political pressure to make allotments freely alienable.  Due to this context, in violation of the fiduciary duties to Freedmen who were often less educated and sophisticated than their former slave masters, the United States, on racially motivated grounds, through the Act of 1908 permitted these allottees to be exploited by grafters and speculators anxious to obtain oil rich lands for little or no payment to allottees.  The allotments belonging to George Curls were in Nowata County, in the midst of this oil rich territory.  The Curls allotment is located North of the lucrative Alluwe Oil Field in the vicinity of the Cherokee Shallow Sands Oil Fields where oil was located a mere thirty-six feet below the surface[2] in 1904.

---

[2] Gary L. Cheatham, "Nowata County, " Encyclopedia of Oklahoma History and Culture, March 28, 2007, and Kenny A Franks, "Petroleum."  <u>Id.</u>

13

27. Allotments in the hands of minor Freedmen were susceptible to being transferred, free from the restrictions placed upon allotments in the hands of Native Americans, if the Defendants failed to observe their fiduciary obligations.

28. George Curls' Nowata County allotments were located in one of the oil rich areas that according to Deboe was ripe for exploitation.

29.     According to Deboe:

The Five Tribes Act provided that all the rolls should close March 4, 1907. But some duplications were afterwards cancelled, and 312 names were added by act of Congress in 1914. The rolls included several small groups that had been incorporated into the tribes, especially about seven hundred Euchees, who formed a part of the Creek Nation, and about a thousand Delawares, who had purchased the right to Cherokee citizenship in 1867. The quantum of blood indicated by the rolls is somewhat misleading, partly because of inaccuracies in matters of this nature at that time seemed unimportant, and partly because fullblood Indians of mixed tribal descent were classed as mixed bloods. The final rolls are as follows:

|  | INDIANS | | | WHITES | **FREEDMEN** | TOTAL |
|---|---|---|---|---|---|---|
|  | *Fullbloods* | *mixed* | *total* | | | |
| Cherokees | 8,703 | 27,916 | 36,619 | 286 | **4,919** | 41,824 |
| Choctaws | 7.087 | 10,401 | 17,488 | 1,651 | **6,029** | 25,168 |
| Miss. Choc. | 1,357 | 303 | 1,660 | | | 1,660 |
| Chickasaws | 1,515 | 4,144 | 5,659 | 645 | **4,662** | 10,966 |
| Creeks | 6,858 | 5,094 | 11,952 | | **6,809** | 18,761 |
| Seminoles | 1,254 | 887 | | 2,141 | **896** | 3,127 |
| TOTAL | 26,774 | 48,745 | 75,519 | 2,582 | **23,405** | 101,506 |

Deboe, p. 47.

Although the law of 1908 had certainly entrusted [the department] with the responsibility of protecting all minor allottees, it was decided at the very beginning to limit such protection to restricted children. <u>It was, of course, the unrestricted children of Negro, mixed Indian and white, or mixed Indian blood who were subject to the greatest exploitation,</u> but the Department officials believe it wiser to concentrate upon the "real Indians"; as Kelsey said in 1910, with reference to some especially shocking pillaging of unrestricted children, "in my judgment the only remedy … is for the general citizenship of the State of Oklahoma to awake to the fact that the less intelligent residents of the

14

community are being robbed by the connivance of grafters and dishonest officials, and that sooner or later these people who have been robbed will become public charges, and to avoid this ultimate condition public sentiment with respect to getting what the allottee has must change and the citizens must elect honest officers who will protect the minors, whether they be white, red, or black.

But although the district agents' work was limited by such administrative decisions,, there was so much need for reform that like Stolper they accomplished a great deal. During the last six months of the first year of their employment they recovered about $548,306.78. House Reports, 61 Cong., 2 Seas., No. 2273, Vol. II, appendix, 1322-23. Department of the Interior, Annual Report, 1912, II, 486; Indian Office Files, 72545/08 Five Tribes 311. Each agent made a monthly report showing the exact sums that he recovered in specific cases, and these amounts were added to form the totals.

Id.

30. The $300,000 recovered by the Department on behalf of minor Freedmen in 1910 and $548,306.78 in 1911-12, a point in time when George Curls was a minor allottee with land in oil rich Nowata County, and it is unclear whether he even knew at the time that land had been allotted to him, represent royalties for which there should have been an accounting. By reason of overtly racist motives discussed above by Deboe, that did not happen. Mr. Curls' allotment is located squarely within an area known to contain oil in 1910 and to be subject to a lease.

31. Under the terms of Sec. 6 of the Act of 1908, royalties from the allotment held by George Curls were under the ultimate supervision of the Secretary of Department of Interior until Curls reached the age of majority. Accordingly, from December 5, 1910, until January 3, 1918, all royalties on Curls' land were restricted and should have been accounted for by the Secretary. According to Deboe, as set forth on p. 85, of her writing, royalties were collected from Cherokee lands in Nowata and Rogers Counties during this period. To the extent these royalties were owed to a minor Freedmen such as George Curls, the Secretary of Interior had a duty to account for them. The lawful beneficiaries

15

of proceeds from royalties on restricted allotments, such as Mr. Curls' descendants, are entitled to an accounting and declaration.

32. A fiduciary's duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor the assets of his charge. From the inception of the Class Period, defendants breached this duty of investigation and monitoring with respect to Freedmen. During the Class Period, none of the defendants or their predecessors made any attempt to monitor or respond to mistreatment and exploitation of Freedmen minor allotments.

33. The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always discharge its duty with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or moneyed interests.

34. Defendants breached their duty to avoid conflicts of interests and to monitor Freedmen allotments in favor of alienation to European settlers, Oklahoma statehood, and corporate interests.

## VII.    COUNT I – ACCOUNTING AS REQUIRED UNDER THE ACT
### (Against all Defendants)

35. Plaintiffs allege all that has been alleged above as though fully restated herein.

36. Defendants have a duty under Section 6 of the Act of May 27, 1908 to provide an accounting to descendants of minor Freedmen of royalties derived from leases on restricted land held by Freedmen minors.

37. Leases on restricted land held by Freedmen minors generated substantial sums. However due to fraud, exploitation, and defendants' failure to perform the oversight

contemplated by the Act to protect the economic interests of this extremely vulnerable class, the appropriate amounts due to Freedmen minors under the leases was not received and can not be ascertained without an accounting.

38. Defendants deny that they owe any fiduciary duty whatsoever to Plaintiffs and in so doing have denied Plaintiffs' demand for an accounting.

### VIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the court enter judgment as follows:

a. That this Court certify this action as a class action under Rule 23(b)(1), 23(b)(2) and 23(b)(3);

b. That this Court declare that Defendants owed fiduciary duties to Freedmen minors under the Act of May 27, 1908;

c. That this Court order Defendants to provide Plaintiffs an accounting;

d. That this Court award to Plaintiffs reasonable costs and attorneys' fees; and

e. That this Court grant such other relief as may be just and proper.

Respectfully submitted,

*s/Paul A. Robinson*

Paul A. Robinson, Jr.
5 North Third, Ste. 2000
Memphis, TN 38103
Problaw937@hotmail.com