# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LEATRICE TANNER-BROWN, | : | |
| | : | |
| and | : | Civil Action No.: 14-1065 (RC) |
| | : | |
| HARVEST INSTITUTE FREEDMAN | : | Re Document No.: 12 |
| FEDERATION, LLC | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| SALLY JEWELL, | : | |
| Secretary of the Interior, *et al.* | : | |
| | : | |
| Defendants. | : | |

## <u>MEMORANDUM OPINION</u>

### GRANTING DEFENDANTS' MOTION TO DISMISS

## I.  INTRODUCTION

Plaintiffs Leatrice Tanner-Brown and the Harvest Institute Freedman Federation, LLC ("HIFF") filed this class action against Defendants Sally Jewell, the Secretary of the United States Department of the Interior, and Kevin Washburn, the Assistant Secretary for Indian Affairs at the Department of the Interior, in their official capacities seeking an accounting relating to alleged breaches of fiduciary duties concerning land allotted to the minor children of former slaves of Native American tribes.  *See* Compl., ECF No. 1.

Defendants have filed a motion to dismiss the Complaint in its entirety on a variety of grounds.  *See* Defs.' Mot. Dismiss, ECF No. 12; Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Mem. Supp."), ECF No. 13.  For the reasons explained below, the Court finds that Plaintiffs lack standing under Article III of the Constitution and will therefore grant Defendants' motion and

dismiss the Complaint for lack of jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

## II.  FACTUAL BACKGROUND

Plaintiffs filed this action under Rule 23 of the Federal Rules of Civil Procedure on behalf of "all persons who are or were descendants of Freedmen minor allottees of the Five Civilized Tribes."  Compl. ¶ 13.  Given the long, complex, and contentious history of the relationships between the United States, Native American Tribes, and the "Freedmen," it is useful for the Court to begin by providing a very brief overview of the historical background in this case, as alleged by Plaintiffs, before turning to Plaintiffs' particular factual allegations and claims.

### A.  Historical Background and the 1908 Act

During the Civil War, the so-called "Five Civilized Tribes" (i.e., the Seminole, Cherokee, Choctaw, Creek, and Chickasaw Tribes) kept slaves and allied with the Confederacy.  *See* Compl. ¶ 14.  Beginning in 1866, following the defeat of the Confederacy, the United States entered into a series of treaties and agreements with the Five Civilized Tribes that, among other things, emancipated the Tribes' slaves and provided rights for the emancipated slaves (known as the "Freedmen") within the Tribes.  *See id.*; *see also, e.g.,* Treaty of 1866, 14 Stat. 755 (Seminole); Treaty of 1898, 30 Stat. 567 (Seminole); Treaty of 1866, 14 Stat. 785 (Creek); Treaty of 1897, 30 Stat. 496 (Creek); Treaty of 1901, 31 Stat. 861 (Creek); Treaty of 1866, 14 Stat. 799 (Cherokee); Treaty of 1866, 14 Stat. 769 (Choctaw and Chickasaw).  The treaties had a general common purpose between them, but their provisions varied.  *See* Compl. ¶ 14.

In 1898, the United States enacted The Curtis Act, 30 Stat. 495, which allotted the land of the Five Civilized Tribes.  *See id.* ¶ 15.  On May 27, 1908, the United States enacted the law that

that is center to this case.  *See* Act of May 27, 1908, 35 Stat. 312 (the "1908 Act"); Defs.' Mot.

Dismiss Ex. A, ECF No. 13-1 (providing a copy of the 1908 Act).  Section 1 of the 1908 Act

removed all restrictions on land allotted to certain members of the tribes, including allottees

enrolled "as freedmen."  1908 Act § 1; *see also Plains Commerce Bank v. Long Family Land &*

*Cattle Co.*, 554 U.S. 316, 331 (2008) ("The 1908 Act released particular Indian owners from . . .

restrictions ahead of schedule, vesting in them full fee ownership.").  Plaintiffs argue that the

1908 Act did not remove restrictions from land allotted to minors.  *See* Compl. ¶ 15 ("In 1908,

Congress removed restrictions from Freedmen allotments, except land allotted to minors.").  The

heart of Plaintiffs' claim in this action lies with Section 6 of the 1908 Act, which provides in

relevant part cited by Plaintiffs:

> That the persons and property of minor allottees of the Five
> Civilized Tribes shall, except as otherwise specifically provided by
> law, be subject to the jurisdiction of the probate courts of the State
> of Oklahoma. The Secretary of the Interior is hereby empowered,
> under rules and regulations to be prescribed by him, to appoint such
> local representatives within the State of Oklahoma who shall be
> citizens of that State or now domiciled therein as he may deem
> necessary to inquire into and investigate the conduct of guardians or
> curators having in charge the estate of such minors, and whenever
> such representative or representatives of the Secretary of the Interior
> shall be of [the] opinion that the estate of any minor is not being
> properly cared for by the guardian or curator, or that the same is in
> any manner being dissipated or wasted or being permitted to
> deteriorate in value by reason of negligence or carelessness or
> incompetency of the guardian or curator, said representative or
> representatives of the Secretary of the Interior shall have power and
> it shall be their duty to report said matter in full to the proper probate
> court and take the necessary steps to have such matter fully
> investigated, and go to the further extent of prosecuting any
> necessary remedy, either civil or criminal, or both, to preserve the
> property and protect the interests of said minor allottees; and it shall
> be the further duty of such representative or representatives to make
> full and complete reports to the Secretary of the Interior. All such
> reports, either to the Secretary of the Interior or to the proper probate
> court, shall become public records and subject to the inspection and
> examination of the public, and the necessary court fees shall be

> allowed against the estates of said minors. The probate courts may, in their discretion appoint any such representative of the Secretary of the Interior as guardian or curator for such minors, without fee or charge.
>
> And said representatives of the Secretary of the Interior are further authorized, and it is made their duty, to counsel and advise all allottees, adult or minor, having restricted lands of all of their legal rights with reference to their restricted lands, without charge, and to advise them in the preparation of all leases authorized by law to be made, and at the request of any allottee having restricted land he shall, without charge, except the necessary court and recording fees and expenses, if any, in the name of the allottee, take such steps as may be necessary, including bringing any such suit or suits and the prosecution and appeal thereof, to cancel and annul any deed, conveyance, mortgage, lease, contract to sell, power of attorney, or any other encumbrance of any kind or character, made or attempted to be made or executed in violation of this Act or any other Act of Congress, and to take all steps necessary to assist said allottees in acquiring and retaining possession of their restricted lands.

1908 Act § 6.  Plaintiffs' claim is premised on their argument that Section 6 imposed a specific fiduciary duty on the Secretary of the Interior to account for any royalties derived from any leases on land allotted to minor Freedmen.  *See, e.g.,* Compl. ¶ 15; *id.* ¶ 24; *id.* ¶¶ 31–33; *id.* ¶ 36.

Plaintiffs generally allege that there was "[a] pervasive system of corruption and racism . . . in Indian Country during the period following the discovery of oil and Oklahoma statehood." *Id.* ¶ 25.  They claim that land was allotted to Freedmen in an attempt to overcome "protections designed to prevent illiterate and uneducated allottees from being swindled by unscrupulous persons."  *Id.*  They claim that the Department of the Interior, through district agents presumably acting pursuant to the 1908 Act, recovered money on behalf of minor allottees.[1]  *See id.* ¶ 30.

---

[1]      Plaintiffs specifically allege that the Department of the Interior recovered $300,000 on behalf of minor Freedmen in 1910 and $548,306.78 between 1911 and 1912.  *See* Compl. ¶ 30. From the face of the Complaint, the sole source for these figures appears to be a book titled *And Waters Still Run* authored by Angie Deboe in 1940.  *See id.* ¶ 29 (quoting Angie Deboe, *And Waters Still Run* 47 (Princeton Univ. Press 1940)).  The provided quote, however, does not

### B.  Allegations Specific to Ms. Tanner-Brown and HIFF

Plaintiff Leatrice Tanner-Brown, who seeks to represent the putative class of Freedmen descendants, alleges that her grandfather, George Curls, was the son of former Cherokee slaves and was enrolled as a Cherokee Freedman pursuant to the Dawes Act when he was five years old.  *See* Compl. ¶ 9.  She further alleges that Mr. Curls received allotment deeds of 40 acres and 20 acres located in Nowata County, Oklahoma from the Cherokee tribe on December 5, 1910 when he was 13 years old.  *See id.*; *id.* ¶¶ 25–26.  She alleges that Mr. Curls's allotted land was located "in the midst of oil rich Cherokee Country," *id.* ¶ 25, and "[n]orth of the lucrative Alluwe Oil Field in the vicinity of the Cherokee Shallow Sands Oil Fields where oil was located a mere thirty-six feet below the surface in 1904," *id.* ¶ 26.  *See also id.* ¶ 28 (alleging that the allotments were "located in one of the oil rich areas that according to Deboe was ripe for exploitation").  She alleges that the Department of the Interior, however, has no record of any royalties derived from any lease on Mr. Curls's allotments.  *See id.* ¶ 24.

The only other named Plaintiff, HIFF, which also seeks to represent the putative class, describes itself as a company "formed for the specific purpose of seeking redress through the courts to compel the United States to perform obligations owed under federal law to Freedmen." *Id.* ¶ 10.  HIFF states that its members, none of whom it specifically identifies, are "persons with African and Native American ancestry."  *Id.*

---

provide a figure of $300,000 for the year of 1910 and states that $548,306.78 was recovered "[d]uring the last six months of the first year of their employment," rather than between the years 1911 and 1912.  *Id.*  From the excerpt, it is unclear to what year the author refers.  Moreover, the context of the quote suggests that the $548,306.78 figure accounts for money recovered on behalf of *all* minor allottees, rather than only minor Freedmen.  As discussed, *infra*, this is but one of many instances in which a source relied upon by Plaintiffs does not support their factual propositions.

In this action, Plaintiffs claim that Defendants breached the fiduciary duties purportedly imposed by Section 6 of the 1908 Act and seek:  (a) certification of this action as a class action under Rule 23(b) of the Federal Rules of Civil Procedure;[2] (b) a declaration that Defendants owed fiduciary duties to minor Freedmen under the 1908 Act; (c) an order directing Defendants to provide Plaintiffs an accounting; (d) an award of reasonable costs and attorneys' fees; and (e) any other relief as may be just and proper.  *See id.* § VIII.

### III.  ANALYSIS

Defendants move to dismiss the Complaint in its entirety on a number of grounds, arguing, among other things, that:  Plaintiffs lack constitutional standing; Plaintiffs' claim is barred by the statute of limitations; the Administrative Procedure Act does not waive sovereign immunity for this action; Plaintiffs fail to state a claim upon which relief may be granted; and Plaintiffs' claim is precluded under the doctrine of *res judicata*.  *See* Defs.' Mem. Supp. at 19–32.  The Court addresses constitutional standing as a threshold issue, first reviewing the applicable legal standard and then assessing the standing of each of the two named Plaintiffs, Ms. Tanner-Brown and HIFF, separately.  Due to the Court's finding that Plaintiffs lack constitutional standing, the Court does not reach the remainder of Defendants' arguments.[3]

---

[2]     While the present motion remained pending, Plaintiffs separately filed a motion for class certification, which Defendants moved to strike.  *See* Pls.' Mot. Class Certification, ECF No. 20; Defs.' Mot. Strike Pls.' Mot. Class Certification, ECF No. 22.  In light of the Court's dismissal of the case for lack of jurisdiction, those motions will be terminated.

[3]     The Court is skeptical, however, as to whether Plaintiffs' Complaint could survive dismissal on other grounds.  For example, the Complaint may be barred by the general six-year statute of limitations for civil actions brought against the federal government.  *See* 28 U.S.C. § 2401.  A cause of action for breach of trust accrues when the trustee repudiates the trust and the beneficiary has knowledge of the repudiation.  *See Cobell v. Norton*, 260 F. Supp. 2d 98, 104–06 (D.D.C. 2003).  Plaintiffs do not address Defendants' arguments that Defendants repudiated any trust duty at least as early as April 2007, seven years before Plaintiffs filed this action.  Instead, Plaintiffs argue only that Public Law 108-108, which was superseded by identical language in

### A.  Applicable Legal Standard

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides for the dismissal of an

action for lack of subject matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  The issue of

constitutional standing is a jurisdictional one, because "the defect of standing is a defect in

subject matter jurisdiction."  *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).  "The court

must address the issue of jurisdiction as a threshold matter, because absent jurisdiction the court

lacks the authority to decide the case on any other grounds."  *Am. Farm Bureau v. EPA*, 121 F.

Supp. 2d 84, 91 (D.D.C. 2000).

Article III of the U.S. Constitution limits federal courts' jurisdiction to particular "cases"

and "controversies."  U.S. Const. Art. 3, § 2, cl. 1.  The Supreme Court has consistently

explained that "[n]o principle is more fundamental to the judiciary's proper role in our system of

government than the constitutional limitation of federal court jurisdiction to actual cases or

controversies."  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013) (quoting

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)).  "The 'irreducible constitutional

minimum' for standing is (i) the party must have suffered a concrete and particularized injury in

---

Public Law 113-76 and tolls the statute of limitations for claims "concerning losses to or
mismanagement of trust funds" until an accounting has been furnished to the beneficiaries, is
controlling. Pls.' P. & A. Opp'n Defs.' Mot. Dismiss at 21, ECF No. 16; Consolidated
Appropriations Act, 2014, Pub. L. No. 113-76, 128 Stat. 5, 305–06 (2014).  The Federal Circuit,
however, has observed that this language distinguishes between "losses to and mismanagement
of trust *funds*, and losses to and mismanagement of trust *assets*," tolling the statute of limitations
only for claims involving the former category.  *Shoshone Indian Tribe of Wind River
Reservation, Wyo. v. United States*, 672 F.3d 1021, 1034 (Fed. Cir. 2012).  The Federal Circuit
has further observed that a failure to obtain maximum benefit from a mineral asset or "a claim
premised upon the Government's failure to collect royalties in accordance with a hypothetical
lease is a claim for mismanagement of trust assets" and not subject to the tolling provision.  *Id.* at
1034–35.  As discussed, *infra*, Plaintiffs do not allege that there were actually any leases on
George Curls's allotted land or that any other particular lease on allotted land was mismanaged
and therefore appear to premise their claim on hypothetical leases, rendering the tolling provision
inapplicable.

fact, (ii) that was caused by or is fairly traceable to the actions of the defendant, and (iii) is capable of resolution and likely to be redressed by judicial decision." *Sierra Club v. EPA*, 755 F.3d 968, 973 (D.C. Cir. 2014). In other words, to establish standing as a constitutional matter a plaintiff must "demonstrate the existence of a 'personal injury fairly traceable to the opposing party's allegedly unlawful conduct and likely to be redressed by the requested relief." *Delta Air Lines, Inc. v. Export-Import Bank of U.S.*, 85 F. Supp. 3d 250, 260 (D.D.C. 2015) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). And, to show an injury in fact, a plaintiff must have suffered "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted).

Plaintiffs bear the burden of demonstrating their standing. *See id.* at 561. When assessing standing at the motion to dismiss stage, the Court will "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor," but will "not assume the truth of legal conclusions, nor . . . accept inferences that are unsupported by the facts set out in the complaint." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (internal quotation marks and citations omitted). "Nevertheless, threadbare recitals of the elements of standing, supported by mere conclusory statements, do not suffice." *Id.* (internal quotation marks and citation omitted). "Moreover, because subject-matter jurisdiction relates to the Court's power to hear the claim, the Court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion." *Am. Fed'n Gov't Emps. v. Sec'y Air Force*, 841 F. Supp. 2d 233, 235–36 (D.D.C. 2012) (citing *Uberoi v. EEOC*, 180 F. Supp. 2d 42, 44 (D.D.C. 2001)). Thus, with respect to Defendants' motion, the Court is not limited to the allegations contained in the Complaint. *See*

*Wilderness Soc'y v. Griles*, 824 F.2d 4, 16 n.10 (D.C. Cir. 1987).  Instead, "where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).

### B.  Leatrice Tanner-Brown

Defendants argue that Ms. Tanner-Brown lacks constitutional standing because she "fails to allege a concrete, particularized injury traceable to the Secretary's action."  Defs.' Mem. Supp. at 19.  For several reasons, the Court agrees.

As a preliminary matter, it is not entirely clear exactly what injury Ms. Tanner-Brown alleges to have suffered, let alone whether that injury is concrete, particularized, and directly traceable to Defendants' action.  In fact, the Complaint mentions Ms. Tanner-Brown by name in only one paragraph, simply stating that she is a representative of the putative class and the granddaughter of George Curls.  *See* Compl. ¶ 9.  The Complaint's allegations instead focus on Mr. Curls and the land allotted to him in 1910.  *See, e.g., id.* ¶¶ 24–31.  Though the Complaint's allegations with respect to Ms. Tanner-Brown are limited, the Complaint does contain allegations relating to the descendants of Freedmen generally.  *See, e.g., id.* (referencing "Freedmen descendants who by reason of their interests in restricted allotments . . . lost or mismanaged trust property"); *id.* ¶ 31 ("The lawful beneficiaries of proceeds from royalties on restricted allotments, such as Mr. Curls' descendants, are entitled to an accounting and declaration.").  Similarly, Plaintiffs' arguments in opposition to the motion to dismiss primarily concern generalized injuries to the descendants of Freedmen as a whole.  Plaintiffs' position regarding standing is perhaps most succinctly stated in the conclusion of their brief's standing argument:

> Plaintiffs have shown that their ancestors were exploited as minors in part of a pervasive scheme to obtain the benefit of oil rich allotments on restricted land.  The [1908 Act] was enacted to prevent exploitation but it required active monitoring and oversight from the Secretary. . . .  [T]he Secretary approved leases on allotments held by minors, but never took any steps to protect them thereafter.  Plaintiffs have standing to seek an accounting *by reason of their relationship to the Freedmen minors.*

Pls.' Mem. P. & A. Opp'n Defs.' Mot. Dismiss ("Pls.' Mem. Opp'n") at 19, ECF No. 16 (emphasis added).

The Complaint's failure to make allegations specific to Ms. Tanner-Brown may itself provide the Court with sufficient grounds to find a lack of standing.  Nevertheless, from Plaintiffs' variety of allegations and arguments, the Court can interpret their theory of injury to Ms. Tanner-Brown to be as follows:  George Curls, as a minor Freedman who was allotted land in 1910, was injured by Defendants' failure to monitor and oversee royalties from his allotments as required by the 1908 Act, and Ms. Tanner-Brown was injured through her hereditary relationship with George Curls.  The Court assesses whether Plaintiffs have established Ms. Tanner-Brown's constitutional standing under this theory and finds that they have not.

George Curls is not a plaintiff in this action.  Ms. Tanner-Brown is.  She does not claim to be suing as the legal representative of his estate.[4]  Instead, she is suing in her personal capacity as a descendant.  It is well-established that a plaintiff must "'show that [s]he *personally* has

---

[4]     Mr. Curls's death certificate, submitted to the Court in support of Plaintiffs' separate motion for class certification, indicates that Mr. Curls passed away in 1967.  *See* Pls.' Mot. Class Certification Ex. B., ECF No. 21-2.  Had Ms. Tanner-Brown filed her suit as the legal representative of his estate, the Court's standing inquiry would focus exclusively on the alleged injury to Mr. Curls.  *See In re African-American Slave Descendants Litig.*, 471 F.3d 754, 762 (7th Cir. 2006), *cert. denied* 128 S. Ct. 92 (2007) (holding that descendants of former slaves claiming to sue as representatives of their ancestors' estates authorized to sue on their behalf "just have to prove the injury to the ancestors; the trickle-down question is elided").  In any case, as discussed, *infra*, Plaintiffs have generally failed to allege any concrete, particularized injury to Mr. Curls in the Complaint, and there is little, if any, support for such a finding in the record.

suffered some actual or threatened injury as a result of putatively illegal conduct of the defendant.'" *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 (1979)) (emphasis added); *see also Raines v. Byrd*, 521 U.S. 811, 819 (1997) ("We have consistently stressed that a plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him."); *Lujan*, 504 U.S. at 560 n.1 (stating that a "particularized" injury is one that "affect[s] the plaintiff in a personal and individual way"). Here, Plaintiffs assert that Ms. Tanner-Brown has suffered a personal injury solely through her hereditary relationship with Mr. Curls, whom she alleges suffered an injury.

Courts have rejected the notion that a plaintiff can suffer an injury for purposes of constitutional standing simply by virtue of an injury suffered by her ancestors. Most notably, the Seventh Circuit has held that plaintiffs suing in their capacity as descendants of former slaves lacked standing to assert claims concerning injuries to their ancestors. *See In re African-American Slave Descendants Litig.*, 471 F.3d 754, 759–61 (7th Cir. 2006), *cert. denied* 128 S. Ct. 92 (2007). As Judge Posner wrote in that decision: "[T]here is a fatal disconnect between the victims and the plaintiffs. When a person is wronged he can seek redress, and if he wins, his descendants may benefit, but the wrong to the ancestor is not a wrong to the descendants." *Id.* at 759. In order to meet their burden of establishing constitutional standing, Plaintiffs must show that Ms. Tanner-Brown suffered a concrete, particularized injury through more than simply genealogy. They fail to do that. Plaintiffs do not allege, for example, that had Defendants properly monitored Mr. Curls's allotments while he was a minor, Ms. Tanner-Brown would have

received an inheritance.[5]  Instead, Plaintiffs present two arguments in their opposition to the motion to dismiss on this issue, neither of which has merit.

First, Plaintiffs provide a letter dated May 1, 2013 that Ms. Tanner-Brown purportedly received in connection with *Cobell v. Salazar*, Civ. No. 96-1285 (D.D.C.), a large class action suit that concerned income from Indian trust assets, stating that her "eligibility as a Trust Administration Class Member has been established."  Pls.' Opp'n Ex. A, ECF No. 16-1. Plaintiffs argue that because *Cobell* "required class members to have an injury directly traceable to the action or inaction to the Secretary," the determination as stated in the letter "is clear evidence of a finding that she suffered an injury directly traceable to the inaction of the Secretary."  Pls.' Mem. Opp'n at 16.  While it is of course true that both here and in *Cobell*, the plaintiffs must demonstrate an injury directly traceable to the defendants, that is the basic requirement for establishing standing in any case brought in any federal court under Article III. Standing in one case does not establish standing in every other case.  Plaintiffs do not offer the Court any explanation as to how the injury that Ms. Tanner-Brown purportedly suffered in connection with the claims in *Cobell* is equivalent to any injury suffered in connection with Plaintiffs' claim in this case.  The letter itself provides little context, devoid of any explanation as to how the class eligibility determination was made with respect to Ms. Tanner-Brown.  *See* Pls.'

---

[5]      Had Plaintiffs alleged such an injury, they would have needed to overcome significant and perhaps insurmountable hurdles to establish that the injury is directly traceable to Defendants' action or inaction.  They would have needed to show, for example, that had Defendants fulfilled their purported statutory duty, Mr. Curls would have received royalties or at least royalties in a greater amount than any that he did receive.  They would also have needed to show that those royalties would have been ultimately inherited by Ms. Tanner-Brown.  There is no such evidence in the record before the Court, and it is likely that the Court would determine the alleged injury to be simply "conjectural or hypothetical."  *Lujan*, 504 U.S. at 560; *see also In re African-American Slave Descendants Litig.*, 471 F.3d at 759 (stating that the "causal chain is too long and has too many weak links for a court to be able to find that the defendants' conduct harmed the plaintiffs at all").

Opp'n Ex. A.  On the contrary, as Defendants observe, the letter actually indicates that Ms. Tanner-Brown was determined to be eligible on a basis that was *distinct* from being "an heir to a deceased . . . individual who owned restricted or trust lands."  *Id.*  Moreover, even to the extent that additional context could give the letter some relevance here, its weight would be limited, as Ms. Tanner-Brown does not point the Court to any judicial or other precedential determination of her eligibility in that case.[6]

Second, Plaintiffs claim that exhibits attached to their opposition to the motion to dismiss "establish[] Leatrice Tanner-Brown as a person who has interest [sic] in restricted land."  Pls.' Mem. Opp'n at 12–13.  The cited exhibits comprise dozens of documents, most of them over 100 years old, and total over 300 pages.  *See* Pls.' Opp'n Exs. A–H, ECF Nos. 16-1–22.  They do not appear to have been organized in any way, and many of the documents are barely legible. Plaintiffs do not provide the Court with any description of these documents or explain how exactly they demonstrate standing.  Nevertheless, the Court has closely reviewed them, along with another set of documents that Plaintiffs separately submitted in support of their motion for class certification, *see* Pls.' Mot. Class Certification Exs. A–Q, ECF Nos. 21-1–22, in order to assess standing.

---

[6]     In their opposition brief, Plaintiffs state that Ms. Tanner-Brown "opted not to participate as a Trust Administration Claim member" in *Cobell*.  Pls.' Mem. Opp'n at 16.  The Court notes that in 2011, both Ms. Tanner-Brown and HIFF moved to intervene in *Cobell*, and the court denied their motion, holding, in part, that neither Ms. Tanner-Brown nor HIFF were "members of either settling class in this case."  Order at 2, *Cobell*, Civ. No. 96-1285 (TFH), ECF No. 3772 (May 23, 2011), *recons. denied* Order, ECF No. 3800, *appeal dismissed* Order, No. 11-5158 (D.C. Cir. 2011) (per curiam).  Plaintiffs also separately filed a suit in the Southern District of Ohio seeking to enjoin the United States from enforcing a law passed by Congress to implement the settlement in *Cobell*, which the court dismissed for lack of standing, holding that "[t]he claims presented by the *Cobell* plaintiffs are different than the claims asserted by Plaintiffs in this action."  Op. & Order, *Harvest Institute Freedmen Fed'n, LLC v. United States*, Civ. No. 10-1131 (S.D. Ohio Jan. 31, 2011), *aff'd* 478 Fed. App'x 322 (6th Cir. 2012), *cert. denied* 133 S. Ct. 673 (2012).

None of the documents indicate that Ms. Tanner-Brown has any interest in restricted land allotted to minor Freedmen. Only a handful of these documents even refer to Ms. Tanner-Brown at all. Of those, the only conceivably relevant document is titled "Engagement List of Clients." Pls.' Opp'n Ex. G, ECF No. 16-21. There is no indication as to the author, source, or veracity of the document. The document simply indicates that Ms. Tanner-Brown and three other individuals are the great grandchildren of Riley Curls and the grandchildren of George Curls, and it provides a list of Ms. Tanner-Brown's children and grandchildren. *See id.* The document in no way indicates the existence of any property interest in allotted land. The remainder of the documents generally concern the affairs of George Curls and his siblings while they were minors, including their allotments and guardians, but none support the proposition that Ms. Tanner-Brown acquired a property interest in any land. On the contrary, a document submitted by Plaintiffs in connection with their motion for class certification indicates that George Curls and his wife transferred the entirety of their apparently then-joint interest in the allotted lands to a person named J.B. Thompson, to whom Ms. Tanner-Brown does not claim to be related, on December 20, 1919, when Mr. Curls was 22 years old. *See* Pls.' Mot. Certify Class Ex. C at 7–8, ECF No. 21-3.

Finally, the Court notes that even if an injury suffered by George Curls could somehow provide Ms. Tanner-Brown with standing in this case, Plaintiffs have generally failed to even allege facts demonstrating that he suffered a concrete, particularized injury that is directly traceable to Defendants. Plaintiffs allege that Mr. Curls received the allotments at issue in 1910. *See* Compl. ¶¶ 25–26. Plaintiffs' allegations do not, however, go much further than that towards establishing the requisite injury. Though Plaintiffs allege that the land allotted to him was located in a general area of Oklahoma known to be rich in oil and near *other* allotments that were

subject to oil and gas leases, *see, e.g., id.* ¶¶ 25, 26, 28, 30, they do not actually allege that there was any oil or gas located on *his* land.  Nor do they allege that Mr. Curls's land was subject to any oil and gas leases or that he was entitled to royalties, let alone that his royalties were mismanaged.  Plaintiffs do not make any such argument in their opposition to the motion to dismiss either.

Instead, Plaintiffs broadly claim that the same set of historical documents that they cite as support for Ms. Tanner-Brown's interest in restricted land also "unequivocally demonstrate" that Plaintiffs are descendants of minor Freedmen whose "allotments were subject to oil, gas, and other forms of leases" and that "royalties were paid under these leases" while the minor Freedmen held the allotments.  Pls.' Mem. Opp'n at 2.  Here again, Plaintiffs do not offer any reasoning for their argument or provide any analysis or explanation of the documents.  The documents offer little, if any, support for the proposition that Mr. Curls suffered any concrete and particularized injury.  Most of the documents do not even concern George Curls but rather concern his siblings, and many, if not most, predate his allotments in 1910.  These documents might support an inference that Mr. Curls's siblings suffered injuries in connection with leases signed on their behalf, but they provide little basis for such an inference with respect to him.[7]

---

[7]     The documents indicate that there were oil, gas, and other leases on land allotted to the siblings while they were minors from which royalties were owed.  *See, e.g.,* Pls.' Opp'n Ex. B at 1–2, ECF No. 16-2 (oil and gas lease signed on behalf of Julius Curls in 1907); *id.* at 3 (agricultural lease signed on behalf of Stephenia Curls); *id.* at 6 (oil and gas lease signed on behalf of Julius Curls in 1907); Pls.' Opp'n Ex. C, ECF No. 16-3 (oil and gas lease signed on behalf of Julius Curls in 1908); Pls.' Opp'n Ex. D at 5–8, ECF No. 16-4 (oil and gas lease signed on behalf of James Curls in 1908).  There is also some limited evidence of mismanagement or impropriety on the part of a man named Rathburn Alden, who appears to have served as the guardian of George Curls and his siblings for a short period.  *See* Pls.' Opp'n Ex. F at 2, ECF No. 16-6 (petition by Riley Curls dated August 14, 1906 to appoint Alden as guardian of the estates).  One document is a petition by Riley Curls dated November 1907 seeking to revoke the appointment of Alden as the children's guardian.  *See* Pls.' Mot. Class Certification Ex. G, ECF No. 21-7.  In the petition, Riley Curls accused Alden of impropriety with respect to oil and gas

None of these documents suggest, for example, that there were any oil and gas leases on land allotted to George Curls or that George Curls was owed royalties relating to any oil and gas on his land.  Any inference of an injury suffered by George Curls would be mere conjecture based on the evidence concerning his siblings.

For these reasons, the Court concludes that Plaintiffs have failed to meet their burden of establishing Ms. Tanner-Brown's constitutional standing.  Accordingly, dismissal with respect to Ms. Tanner-Brown pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure is appropriate.

### C.  Harvest Institute Freedman Federation, LLC

The Court also finds that HIFF, the only other named Plaintiff in this action, lacks constitutional standing.

HIFF does not claim to have standing under Article III based on an injury to itself. Instead, HIFF claims to represent its members and the purported class at large.  *See* Compl. ¶ 10; Pls.' Mem. Opp'n at 20.  "An association only has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests it seeks to protect are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Fund Democracy, LLC v. SEC.*, 278 F.3d 21, 25 (D.C. Cir. 2002) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)); *see also Warth v. Seldin*, 422 U.S.

---

leases, though it does not specify which child's allotments were involved.  *See id.*  It seems doubtful that this document could support a finding that George Curls suffered the injury that Plaintiffs assert, because he did not receive his allotments until 1910.  Though it appears that this petition to revoke Alden's appointment was denied, *see* Pls.' Mot. Class Certification Ex. H, ECF No. 21-6 (recommendation by Special Master to deny the petition), Riley Curls was ultimately appointed guardian of George and his siblings in August 1908, more than two years before George received his allotments.  *See* Pls.' Mot. Class Certification Ex. J, ECF No. 21-10.

490, 511 (1975); *Sierra Club v. EPA*, 754 F.3d 995, 998–999 (D.C. Cir. 2014).  Defendants

argue that HIFF has failed to meet its burden in establishing the first and third of these criteria,

and the Court agrees.

In order to satisfy the first criterion, HIFF must show that at least one of its members

would have standing if the member brought suit himself.  *See Am. Library Ass'n v. FCC*, 401

F.3d 489, 493 (D.C. Cir. 2005); *see also Warth*, 422 U.S. at 511 ("The association must allege

that its members, or any one of them, are suffering immediate or threatened injury as a result of

the challenged action of the sort that would make out a justiciable case had the members

themselves brought suit.").  The Complaint makes only cursory and conclusory allegations

concerning HIFF's membership, simply alleging that its "membership is comprised of persons

with African and Native American ancestry, each of whom has standing to sue in their own

right."  Compl. ¶ 10.  Plaintiffs offer only slightly more detail in their opposition to the motion to

dismiss:  "[HIFF] has standing because it is HIFF who educated, organized, and assisted persons

such as Leatrice Tanner-Brown on how to vindicate their interests. . . .  HIFF has standing

because its members, descendants of Freedmen minors, have standing."  Pls.' Mem. Opp'n at 20.

This is insufficient.  First, HIFF's work in educating and assisting Freedmen descendants,

while potentially relevant to the second, uncontested criterion for associational standing, bears no

relevance to the first criterion, as it provides no information concerning HIFF's members.[8]  More

importantly, not every descendant of every minor Freedman has constitutional standing.

Plaintiffs do not even allege that any HIFF member's ancestor received allotments as a minor, let

alone that the ancestor had leases on the allotted land or that royalties on the allotted land were

---

[8]      The Court notes that, from the face of the Complaint and Plaintiffs' opposition, it is not
even clear whether Ms. Tanner-Brown is a member of HIFF.  HIFF does not identify any other
individuals as members.

mismanaged.  Even if Plaintiffs had made such allegations, as the Court explained in its finding

that Ms. Tanner-Brown lacks standing, Plaintiffs would still need to allege that a member of

HIFF *personally* suffered an injury beyond simply a genealogical relationship with the injured

Freedman.  Plaintiffs have entirely failed to meet their burden on the first criterion, which is

alone sufficient for a finding that HIFF lacks standing.

Plaintiffs also fail to establish that neither the claim asserted here nor the relief requested

require the participation of HIFF's individual members in the lawsuit.  In their motion to dismiss,

Defendants argue that, assuming Plaintiffs' legal theory that Defendants owed a duty towards

minor Freedmen is valid, "there is no way to determine whether the duty was breached without

specific allegations for each individual allottee and his/her lease terms" and "HIFF, an advocacy

group, cannot represent each individual allottee (or descendant) in this context."  Defs.' Mem.

Supp. at 24.  Although Plaintiffs acknowledge the existence of this criterion for HIFF's standing

in their opposition to the motion to dismiss, they wholly fail to respond to Defendants' argument

on this issue or otherwise argue that individual participation is not needed.  *See* Pls.' Mem.

Opp'n at 20 (quoting *Int'l Union, United Automobile, Aerospace & Agric. Implement Workers of*

*Am. v. Brock*, 477 U.S. 274, 285 (1986)).  "It is well understood in this Circuit that when a

plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by

the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."

*Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C.

2002) (citing *FDIC v. Bender*, 127 F.3d 58, 67–68 (D.C. Cir. 1997); *Stephenson v. Cox*, 223 F.

Supp. 2d 119, 121 (D.D.C. 2002)).  The Court thus treats Plaintiffs as having conceded that the

third criterion for HIFF's standing has not been satisfied.

The Court therefore finds that HIFF also lacks constitutional standing, and, accordingly, dismissal pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure is appropriate.

## IV.  CONCLUSION

For the foregoing reasons, the Court will **GRANT** Defendants' Motion to Dismiss (ECF No. 12) and dismiss the Complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of jurisdiction.

Dated:  January 27, 2016

RUDOLPH CONTRERAS
United States District Judge